IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOSEPH MEEHAN,<br><br>            Defendant. | CRIMINAL ACTION<br>NO. 11-0440 |

**OPINION**

**Slomsky, J.**                                                                                                                                                 May 3, 2013

## I.    INTRODUCTION

On December 1, 2011, Defendant Joseph Meehan was indicted and charged with various offenses, including attempted robbery and Hobbs Act robbery. He was also charged with attempted armed carjacking, using and carrying a firearm during a crime of violence, witness tampering, possessing with intent to distribute controlled substances, and being a felon in possession of a firearm.

The charges stem from robberies that took place at pharmacies located in Philadelphia, Pennsylvania, on February 9 and 14, 2011, and events following the robberies. Defendant was identified as a perpetrator of the robberies. Thereafter, a major effort to locate Defendant was undertaken by Special Agents of the Federal Bureau of Investigation ("FBI") and the Philadelphia Police Department.

On February 17, 2011, using data obtained from a cell phone, Defendant was tracked to the Riviera Motel, 2120 Route 73, Pennsauken, New Jersey. (Doc. No. 125 at 1; Doc. No. 119 at 22.) An FBI Task Force, Agents of the Pennsylvania Board of Probation and Parole, and New Jersey State Police conducted surveillance at the motel and observed Defendant walking outside Room 74. (Doc. No. 119 at 50.) Defendant was observed walking on crutches with a bandage

1

on his foot, which he may have placed there after being shot by Philadelphia Police when fleeing the scene of the February 14, 2011 robbery. (Id.; Doc. No. 117 at 6–7.)

While Defendant and his companion, Leah Ann Sabatino, were walking outside Room 74, law enforcement agents quickly approached Defendant and Sabatino and arrested them. (Doc. No. 119 at 56.) Defendant contends that during the arrest, officers kicked his crutches away, and one officer stomped on his foot, causing him to scream in pain. (Id.) While hearing Defendant scream in pain, Sabatino pleaded with the officers to stop beating Defendant, and, ostensibly in an effort to appease the police and stop the beating, told the officers that contraband was located inside their motel room. (Doc. No. 119 at 4–5.)

As a result of these events, Detective William Wheeler of the Pennsauken Police Department and Detective Timothy Tague of the Philadelphia Police Department prepared an affidavit of probable cause to search Room 74 of the motel. They submitted the affidavit to a New Jersey Municipal Court Judge in support of a request for a search warrant. (Id. at 21–23; Doc. No. 125 at 1.) The affidavit provided as follows:

> Det. Timothy G. Tague #8071, being of full age and being sworn according to law, upon my oath, deposes and says:
> . . . .
> On 2/17/2011 I was contacted by Detective William McCusker of the Philadelphia Police Department. Detective McCusker informed me that he was looking for a robbery suspect who was wanted for a parole violation out of Philadelphia. The suspect was entered into NCIC/SCIC as a Wanted Person. This suspect is also wanted for questioning regarding three armed robberies which had occurred in Philadelphia, on 1/31/2011, 2/9/2011 and 2/14/2011. During the armed robbery of 2/14/2011 the suspect exchanged gun fire with Philadelphia Police. During these robberies it was reported that a large amount of prescription drugs and currency were taken. Detective McCusker advised that cell phone information was being received from the area of Rt. 73 and Haddonfield Rd., Pennsauken, NJ. I informed Detective McCusker that the location was in the immediate area of the Riviera Motel. Approximately two hours transpired when I received a phone call from Detective McCusker advising that the suspect had been located at the Riviera Motel coming out of room 74 with a female. The suspect was placed under arrest. The female was identified as Leah Anne Sabatino, date of birth

> 4/2/1981. She was detained by police and interviewed. She advised police she had rented the room using her identification. The suspect did not possess any identification. She stated that she has stayed with the suspect in room 74 since Tuesday (2/15/2011) night at approximately 10:00 PM. She also advised police that she has observed a large amount of prescription drugs in room 74.

(Doc. No. 119 at 22.) Based on this affidavit, the court issued a search warrant for Room 74.

Defendant contends that the affidavit contained a material omission that rendered the affidavit false, and warrants a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978). If Defendant presents evidence to show that the affidavit contained a false statement made "knowingly and intentionally, or with reckless disregard for the truth," and that "the allegedly false statement [was] necessary to the finding of probable cause," he is entitled to a hearing on his Franks claim.[1] Id. at 155–56.

Because Defendant has not met his burden, a Franks hearing will not be held.

## II. FACTUAL BACKGROUND

The following facts are derived from allegations in the Government's Trial Memorandum and from Defendant's moving brief. (Doc. Nos. 117, 119.) On February 9, 2011, Defendant and co-Defendant Jonathan Andrews planned to rob the Blue Grass Pharmacy at 2417 Welsh Road, Philadelphia, Pennsylvania. (Doc. No. 117 at 5.) Andrews stole a white Mitsubishi Gallant for use as a getaway car. (Id.) After conducting the robbery and stealing narcotics and cash, Defendant and Andrews fled the scene in the stolen Mitsubishi. (Id.) Philadelphia Police later found the Mitsubishi, which had been wiped down for fingerprints with a chemical, most likely WD-40. (Id.)

---

[1] "At the hearing, the defendant must ultimately prove by a preponderance of the evidence that: (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination." United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006) (citing Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997); Franks, 438 U.S. at 171–72).

Defendant and Andrews next planned the robbery of the CVS Pharmacy located at 8525 Frankford Avenue, Philadelphia, Pennsylvania. (Id.) Defendant recruited Anthony Menachella to be a getaway driver. (Id.) Andrews and Menachella purchased walkie-talkies for use in the robbery. (Id. at 5–6.) Andrews stole another car for use as a getaway vehicle. (Id. at 6.) On the morning of February 14, 2011, the getaway car's battery was dead, and Menachella decided to back out of the robbery. (Id.) Defendant recruited Randy Parsons to replace Menachella as the getaway driver.[2] (Id.) Parsons used his personal vehicle as the getaway car. (Id.)

On February 14, 2011 at approximately 8:30 p.m., Defendant, Andrews, and Parsons entered the CVS Pharmacy on Frankford Avenue. (Id.) Defendant and Parsons were armed with handguns and Andrews carried a BB gun. (Id.) While Parsons apparently stood as lookout near the front of the store, Andrews went through the cash registers, and Defendant ran to the rear of the store, where the pharmacy is located. (Id.) Defendant ordered two pharmacy employees to put pharmaceuticals in a bag. (Id.)

While the robbery was in progress, the Philadelphia Police Department responded to a 911 call, and units began to arrive at the scene. (Id.) Parsons, upon hearing police sirens, fled without informing Defendant or Andrews. (Id.) Two police officers, Schmid and Seymour, entered the store and evacuated customers. (Id.) The officers then moved down the aisles towards the pharmacy at the rear of the store, where Defendant and Andrews were located. (Id.) Schmid shouted at Defendant and Andrews from his position in the aisle. (Id.) Andrews pointed his handgun at the officers. (Id.) Suddenly, a female pharmacist stood up between Andrews and Schmid. (Id.) The officers partially retreated down the aisle. (Id.)

---

[2] Defendant Parsons was charged in a Superseding Indictment. United States v. Parsons, No. 13-0104 (E.D. Pa.) (Doc. No. 15). On May 2, 2013, he entered a plea of not guilty.

Trapped in the pharmacy area, Defendant attempted to break the drive-through window by firing his weapon at the glass, with no effect. (Id.) Defendant then opened the sliding window, which he and Andrews used to exit the pharmacy into the rear driveway. (Id.) Behind the CVS, Defendant and Andrews were confronted by more police. (Id.) Defendant fired his weapon at the police, who returned fire. (Id.) Defendant was apparently shot in the foot during this gunfight. (Id. at 7.) Defendant and Andrews managed to escape by jumping over a fence behind the CVS. (Id. at 6–7.)

Andrews made it back to his car and drove away. (Id. at 7.) He was later arrested by Philadelphia Police and confessed to the robbery. (Id.) He pled guilty before this Court on January 10, 2013. (Doc. No. 99.) The Government intends to call Andrews as a witness against Defendant at trial. (Doc. No. 117 at 7.)

Defendant, who was separated from Andrews, unsuccessfully attempted a carjacking behind the CVS. (Id.) After his failure, he fled into the surrounding neighborhood. (Id.) Defendant managed to elude police despite a canvas of the area. (Id.) He called a friend, Chucky Rhodes, who came to pick him up near the CVS. (Id.) Defendant apparently made incriminating statements to Rhodes about the robbery. (Id.) Already a fugitive from Pennsylvania parole and now wanted for his participation in the robbery and shootout with Philadelphia Police, Defendant began hiding at a series of friends' houses. (Id.) One friend, Nancy Quinn, gave him crutches to help him walk on his wounded foot. (Id.)

The next day, February 15, 2011, Defendant contacted Leah Ann Sabatino by telephone. (Id.) Later that afternoon, Defendant, Sabatino, Menachella, and another woman traveled to Pennsauken, New Jersey and checked into the Riviera Motel. (Id.) Defendant and Sabatino stayed in one room, while Menachella and the other woman stayed in another room. (Id.) The

5

next day, February 16, 2011, Menachella and the other woman returned to Philadelphia. (Id.) In the meantime, Defendant told Sabatino that if they were arrested, Sabatino should tell the police a false story — that she and Defendant had sex at an abandoned house on Heberman Street the night of the CVS robbery, and that Defendant had gone to his ex-wife's house around midnight. (Id.)

Meanwhile, an FBI Task Force had been created to search for Defendant. (Doc. No. 119 at 47, 49–50.) The Task Force tracked Defendant to the Riviera Motel and conducted surveillance in conjunction with agents of the Pennsylvania Board of Probation and Parole and New Jersey State Police. (Id. at 50.) On February 17, 2011, law enforcement officials observed Defendant walking on crutches with a bandage on his leg outside his hotel room. (Id.) While he was outside the room with Sabatino, several officers approached him and Sabatino with guns drawn. (Id. at 39–40, 56.) Two officers took control of Sabatino, while other officers kicked away Defendant's crutches and brought him to the ground. (Id. at 56.) One officer, wearing a ballistic vest with the words "US MARSHALS"[3] on the back, stomped on Defendant's bandaged foot while he was on the ground. (Id. at 19, 56.) Defendant screamed in pain. (Id. at 19.)

While the screaming was occurring, Sabatino was taken to the other side of a nearby wall. (Id. at 14.) From this position, she could hear Defendant screaming in pain. (Id.) While Defendant was screaming around the corner, Sabatino was questioned by an FBI agent. (Id. at 40.) When Sabatino began to tell the agent a fabricated story about Defendant's whereabouts on February 14, 2011, the FBI agent yelled at her and threatened that she "was going to go to jail for a long time." (Id.) Sabatino was "scared and nervous," and upon hearing Defendant's screams,

---

[3] It is unclear who this alleged person was or what agency employed him. Local law enforcement personnel are assigned to the FBI Task Force as Special Deputy U.S. Marshals. (See Doc. No. 119 at 22.)

she yelled "tell them to stop." (Id. at 9, 19.) She then told the FBI agent that there were drugs in her bag located inside Room 74 so that law enforcement would "ease up on" Defendant. (Id. at 45.)

Based in part on Sabatino's statement about the drugs in Room 74, Detective Wheeler of the Pennsauken Police Department and Detective Tague of the Philadelphia Police Department, who were not present at the time Defendant and Sabatino were arrested, prepared the affidavit of probable cause described supra and applied for the warrant to search Room 74. (Id. at 21–23.) On February 17, 2011 at 4:53 p.m., based on this affidavit, a New Jersey Municipal Court Judge issued the search warrant for Room 74. (Id. at 24–25.) Police then searched Room 74 and found a large amount of prescription drugs. (Doc. No. 125 at 1.)

## III. STANDARD OF REVIEW

The United States Supreme Court has held that "a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant subsequent to the ex parte issuance of the warrant." United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006); Franks v. Delaware, 438 U.S. 154, 164–65 (1978). In order to overcome the "general presumption that an affidavit of probable cause supporting a search warrant is valid," entitling a defendant to a Franks hearing, he must first make a "'substantial preliminary showing' that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material to the finding of probable cause." Yusuf, 461 F.3d at 383 (citing Franks, 438 U.S. at 171).

## IV. ANALYSIS

Defendant claims there were material omissions in the affidavit of probable cause that rendered the affidavit false. The omissions consisted of the circumstances under which Leah

7

Ann Sabatino, Defendant's companion, made the statement that there were prescription drugs inside Room 74 at the Riviera Motel. If the information that Defendant claims was intentionally omitted is added to the affidavit, the altered affidavit would read as follows (additions in bold):

> **Det. Tague is acting as co-affiant. When I [Affiant Police Officer Wheeler] advised Asst. Prosecutor Victoria Shilton of the Camden County Prosecutors Office of the request she advised that a detective from Phila. Police will have to be a co-affiant on the Search Warrant Application and Probable Cause Affidavit. Neither myself or Det. Tague were present when the events discussed below occurred. The below information was provided to the affiant(s) by other law enforcement officers, however it is unknown which of those law enforcement officers actually witnessed the below events or which officers actually apprehended and/or questioned either Meehan or Sabatino.** On 2/17/2011 I was contacted by Detective William McCusker of the Philadelphia Police Department. Detective McCusker informed me that he was looking for a robbery suspect who was wanted for a parole violation out of Philadelphia. The suspect was entered into NCIC/SCIC as a Wanted Person. This suspect is also wanted for questioning regarding three armed robberies which had occurred in Philadelphia, on 1/31/2011, 2/9/2011 and 2/14/2011. During the armed robbery of 2/14/2011 the suspect exchanged gun fire with Philadelphia Police. During these robberies it was reported that a large amount of prescription drugs and currency were taken. Detective McCusker advised that cell phone information was being received from the area of Rt. 73 and Haddonfield Rd., Pennsauken, NJ. I informed Detective McCusker that the location was in the immediate area of the Riviera Motel. Approximately two hours transpired when I received a phone call from Detective McCusker advising that the suspect had been located at the Riviera Motel coming out of room 74 with a female. **When exiting the room, the suspect was walking with the aid of crutches. The suspect and the female [Sabatino] were surrounded by numerous law enforcement officers with weapons drawn. The law enforcement officers kicked out the suspect's crutches knocking him to the ground. While the suspect was laying on the ground, not resisting in any way, the law enforcement officers beat the suspect stomping on the suspect's bandaged foot, causing him to scream in pain. While beating the suspect he was questioned about the whereabouts of the gun, and screaming in pain.** The suspect was placed under arrest. The female was identified as Leah Anne Sabatino, date of birth 4/2/1981. She was detained by police and interviewed. She advised police she had rented the room using her identification. The suspect did not possess any identification. She stated that she has stayed with the suspect in room 74 since Tuesday (2/15/2011) night at approximately 10:00 PM. **During the arrest of the suspect, at least 2 law enforcement officers pulled her around a corner a short distance away. Sabatino was purposely kept within hearing distance so she would be able to hear the suspect being subdued, his screaming in pain, and being questioned about the gun. While all of this was going on Sabatino repeatedly yelled "tell**

8

> **them to stop." Sabatino was also being questioned about the gun's location and continued to yell "tell them to stop."** She also advised police that she has observed a large amount of prescription drugs in room 74.

(Doc. No. 119 at 18–19.)

A review of the facts that Defendant alleges should have been included in the affidavit does not lead to the conclusion that affiants knowingly, intentionally, or with reckless disregard for the truth omitted facts to create a falsehood, or that such omission was necessary to the finding of probable cause. Because Defendant has not met his burden of making a "substantial preliminary showing" that the affidavit contained a material false statement, which was made knowingly or with reckless disregard for the truth, Defendant's Motion to Conduct a Franks Hearing and to Suppress Evidence will be denied.

Probable cause affidavits in support of a search warrant application "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." United States v. Ventresca, 380 U.S. 102, 108 (1965). An affiant need not "include every piece of information that was uncovered during the course of the [i]nvestigation, even if that information could possibly cast doubt on the finding of probable cause." Teeple v. Carabba, No. 07-2976, 2009 WL 5033964, at *28 (E.D. Pa. Dec. 22, 2009), aff'd, 398 F. App'x 814 (3d Cir. 2010) (citing Wilson v. Russo, 212 F.3d 781, 787 (3d Cir. 2000)).

Unlike a prosecutor's requirement to turn over exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963), an affiant applying for a warrant is under no duty to reveal exculpatory information to the neutral magistrate. Teeple, 2009 WL 5033964, at *28 (citing Mays v. City of Dayton, 134 F.3d 809, 815 (6th Cir. 1998)); see United States v. Colkley, 899 F.2d 297, 302–03 (4th Cir. 1990) (comparing Brady and Franks and stating that while a Brady violation can occur "without a demonstration of moral culpability," a Franks violation requires a showing of "deliberate falsehood" or "reckless disregard for the truth"). "[O]missions are made

9

with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know . . . ." Wilson, 212 F.3d at 783.

"In order to make a showing that an affiant knowingly or recklessly made false statements, a defendant must challenge the affiant's state of mind as well as the truth of the affidavit." United States v. Harrison, 400 F. Supp. 2d 780, 786 (E.D. Pa. 2005) (citing United States v. Brown, 3 F.3d 673, 676–78 (3d Cir. 1993)). "[I]f the warrant affiant ha[s] no reason to believe the information was false, there [is] no violation of the Fourth Amendment." Franks, 438 U.S. at 172 n.8.

A Franks hearing is appropriate where a defendant alleges material omissions in a warrant, rather than an affirmative falsity, in "rare instances." United States v. Graham, 275 F.3d 490, 506 (6th Cir. 2001). "[A]n allegation of omission potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." Id. at 506 (quoting United States v. Atkin, 107 F.3d 1213, 1217 (6th Cir. 1997)). If a warrant application contains a material omission, the remedy is to insert the omitted information into the affidavit. See United States v. Calisto, 838 F.2d 711, 716 (3d Cir. 1988).

In this case, Defendant highlights two problems with the probable cause affidavit. First, as noted in bold letters in the first part of the altered affidavit, Defendant contends that the affiant detectives, Tague and Wheeler, should have alerted the magistrate that neither affiant was actually present during Meehan's arrest, and that their failure to do so was a material omission. (Doc. No. 119 at 18.) However, as noted in United States v. Yusuf, 461 F.3d 374 (3d Cir. 2006):

> Courts have routinely recognized a distinction between information provided by an informant and that provided by a law enforcement officer or other government agency. Informants are not presumed to be credible, and the government is generally required to show by the totality of the circumstances either that the

> informant has provided reliable information in the past or that the information has been corroborated through independent investigation. . . . In contrast, information received from other law enforcement officials during the course of an investigation is generally presumed to be reliable.

Id. at 384–85 (internal citations omitted) (citing Ventresca, 380 U.S at 111; United States v. Ritter, 416 F.3d 256, 263 (3d Cir. 2005)). Here, although Detectives Tague and Wheeler were not present during Defendant's arrest and did not observe Sabatino's questioning, the information passed on to them by other law enforcement officials is presumed to be reliable.

Second, as noted in the balance of the language in bold letters in the altered affidavit, Defendant contends that the affiant detectives should have included in the affidavit details of Defendant's arrest, including his alleged beating, and, most importantly, the fact that Sabatino was purposely kept within hearing distance of Defendant's screams while being questioned. (Doc. No. 119 at 18–19.) Defendant argues that omitting this information from the affidavit deprived the magistrate of the opportunity to "mak[e] an objective determination regarding the reliability" of Sabatino's statement. (Doc. No. 119 at 6.)

Defendant contends that the magistrate should have known about the circumstances under which Sabatino informed the agents that there were drugs in Room 74 of the motel. Defendant argues that had the magistrate known that she made this statement under the duress of hearing him scream in pain, the magistrate may not have issued the warrant.

The circumstances under which she made the statement only affect her credibility. Law enforcement officials on the scene, however, are not required to determine the motivation of a witness who provides information that supports probable cause. Sabatino's subjective state of mind is not the important factor. As the Third Circuit noted in United States v. Brown:

> It is well-established that a substantial showing of the informant's untruthfulness is not sufficient to warrant a Franks hearing. The Supreme Court made clear throughout Franks that a substantial preliminary showing of intentional or

11

> reckless falsity <u>on the part of the affiant</u> must be made in order for the defendant
> to have a right to an evidentiary hearing on the affiant's veracity.

<u>Brown</u>, 3 F.3d at 677 (emphasis in original).[4] Because Sabatino may have provided untruthful information, it does not follow that the affiants intentionally or recklessly submitted false information to the magistrate. Since there is no obligation on the affiant police officers to provide information about the credibility of the witness, the information would not be of the kind that a magistrate would want to know. See <u>Potts v. City of Philadelphia</u>, 224 F. Supp. 2d 919, 934 (E.D. Pa. 2002) ("A police officer, after all, is not obligated 'to conduct a mini-trial' before arresting a suspect").

Furthermore, Defendant does not contend that Sabatino's statement was untrue. Thus, even if the affiant detectives had included information about her subjective state of mind, it would not undermine the probable cause. If the omission was remedied with the insertion into the affidavit of the circumstances under which she made the statement, because Sabatino's statement is truthful, probable cause to search was clearly established.

Defendant contends that this case is most similar to <u>United States v. Calisto</u>, 838 F.2d 711 (3d Cir. 1988). <u>Calisto</u> does not support Defendant's argument. In <u>Calisto</u>, a confidential informant told a Philadelphia Police Department detective that Calisto had a briefcase containing methamphetamine in his possession. The detective had received tips from the informant in the

---

[4] At the hearing on this matter, Defendant's counsel stated that his arguments did not turn on Sabatino's state of mind. However, during the hearing and in his memorandum of law, counsel cited the words of U.S. Senator John McCain regarding the unreliability of statements made under torture. (Doc. No. 119 at 5.) Even if Sabatino decided to lie to the police in order to stop Defendant's beating, this decision would be the result of her subjective state of mind, which is irrelevant. Moreover, Defendant also argued in his memorandum that the alleged defect in the warrant application prevented the neutral magistrate "from making an objective determination regarding the reliability" of Sabatino's statement. (<u>Id.</u> at 6.) Again, the credibility of Sabatino in the context of the affidavit submitted to the magistrate is irrelevant — the analysis here turns on the state of mind of the warrant affiant, and whether the affiant made statements (or material omissions) intentionally or recklessly with knowledge of their falsity.

past and considered him reliable. The detective passed this information on to a Pennsylvania Crime Commission agent, and told the agent that he wished to keep his identity, and that of his informant, confidential. The Pennsylvania Crime Commission agent passed all of this information on to a U.S. Drug Enforcement Administration ("DEA") agent without revealing the identity of the detective or his informant. The DEA agent then shared the information about Calisto and the briefcase filled with methamphetamine with a Pennsylvania State Police trooper. The trooper asked the DEA agent where the information came from and whether it was reliable. The DEA agent told him that the information came from his confidential source, and that it was reliable.

Based on this information, the trooper applied for a search warrant and swore in an affidavit that the DEA agent had received the tip from his confidential source — when, in fact, the DEA agent had received the tip from another law enforcement officer. When the trooper swore to the affidavit, however, he believed what he had told the magistrate was truthful. Based on the affidavit, the magistrate issued a search warrant. At a Franks hearing, Calisto argued that the trooper's affidavit was materially misleading. The trial court held that although the trooper and DEA agent intended to conceal from the magistrate the involvement of the detective and the Pennsylvania Crime Commission agent, there had been no intent to deceive the magistrate. Calisto appealed.

> The Third Circuit held that from the trooper's perspective:
>
> [T]he affidavit was filed in good faith and accurately reflected the facts as he understood them. We agree with Calisto, however, that this cannot end the matter. If we held that the conduct of [the trooper], as the affiant, was the only relevant conduct for the purpose of applying the teachings of Franks, we would place the privacy rights protected by that case in serious jeopardy. As the Supreme Court noted in Franks, "police [can]not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity."

Calisto, 838 F.2d at 714 (quoting Franks, 438 U.S. at 164 n.6). The court continued:

> We also agree with Calisto that his argument is not answered by the fact that [the trooper's] affidavit is literally true because [the DEA agent's] immediate source was reliable and was believed by [the DEA agent] to be reliable based on several past experiences. If Calisto is correct in his contention that the affidavit is materially misleading, it would make no difference that it could be read literally to correspond with reality.

Id.

The court found that the trooper's affidavit could be read as misleading, because the magistrate may have been under the mistaken impression that the DEA agent "secured the information directly from the original confidential informant source, rather than third-hand through two other law enforcement officers." Id. at 715. Despite this finding, however, the court concluded:

> [W]e are confronted with a situation in which the magistrate may have been intentionally misled into believing that the story of the original confidential source was transmitted to [the trooper] through only one law enforcement officer rather than three. Moreover, it is a situation in which any intent on [the DEA agent's] or [the Pennsylvania Crime Commission agent's] part to mislead the magistrate was occasioned not by a scheme to deceive the magistrate about a material fact, but by a desire to withhold a fact not material to the magistrate's task. . . . Thus, while we agree with Calisto that paragraphs 2, 3, and 6 [in the affidavit] may have been intentionally misleading, the deficiency is far less serious than Calisto maintains both in terms of the potential of those paragraphs for skewing the fact-finding process and in terms of the subjective intentions of the officers involved.

Id.

The same conclusion applies here. Defendant has not made a substantial showing that the affiants acted as part of an intentional scheme to deceive the magistrate. Rather, the affiant detectives withheld nonmaterial information in the affidavit of probable cause. In fact, unlike Calisto, the probable cause affidavit in this case contains no intentionally misleading information that was designed to conceal certain facts from the magistrate. As a result, the warrant application in this case was not made with an intent to deceive the magistrate, nor was it made with a reckless disregard for the truth.

Finally, as the Government argues, there was probable cause to search the hotel room even without Sabatino's statement. Defendant was wanted for a parole violation and for questioning as a suspect about three armed robberies in Philadelphia where prescription drugs and money were stolen. During one armed robbery, he exchanged gunfire with Philadelphia Police. He was from Philadelphia and was tracked to the Riviera Motel in New Jersey a few days after the robbery. He was observed by law enforcement exiting Room 74. He was arrested outside the motel and had no identification on him.

The clear inference from these facts is that evidence to prove Defendant's involvement in the armed robberies or contraband was likely to be located inside Room 74. Thus, even without Sabatino's statement, there was probable cause to search Room 74. See Franks v. Delaware, 438 U.S. 154, 171–72 (1978) (even if a defendant makes a showing that an affidavit contains deliberately false statements or statements made with reckless disregard for the truth, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required").

## V. CONCLUSION

Defendant's Motion to Conduct a Franks Hearing and to Suppress Evidence will be denied. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | |
|---|---|
| v. | CRIMINAL ACTION |
| JOSEPH MEEHAN, | NO. 11-0440 |
| Defendant. | |

# ORDER

**AND NOW**, this 3rd day of May 2013, upon consideration of Defendant's Motion to Conduct a <u>Franks</u> Hearing and to Suppress Evidence (Doc. No. 119), the Government's Response in Opposition (Doc. No. 125), Defendant's Supplemental Note Supporting his Motion for a <u>Franks</u> Hearing (Doc. No. 127), and the arguments of counsel at the hearing held April 11, 2013, and in accordance with the Opinion of the Court issued this day, it is **ORDERED** that Defendant's Motion to Conduct a <u>Franks</u> Hearing and to Suppress Evidence (Doc. No. 119) is **DENIED**.

BY THE COURT:


/s/ Joel H. Slomsky
JOEL H. SLOMSKY, J.